**PAC FUNG FEATHER COMPANY, LTD. and Natural Feather & Textiles, Inc., Plaintiffs,**

v.

**The UNITED STATES, et al., Defendants.**

Slip Op. 95–207.

Court No. 95–10–01299.

United States Court of International Trade.

Dec. 28, 1995.

Neville, Peterson & Williams (John M. Peterson, George W. Thompson, Margaret R. Polito, Arthur K. Purcell and James A. Marino) for plaintiffs.

Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Rhonda K. Schnare), Mark G. Nackman, General Attorney, Office of Assistant Chief Counsel, International Trade Litigation, United States Customs Service, of counsel, for defendants.

### OPINION

RESTANI, Judge:

This action is before the court on cross-motions for summary judgment made pursuant to USCIT Rule 56 by plaintiffs Pac Fung Feather Company, Ltd. ("Pac Fung") and Natural Feather & Textiles, Inc., Pac Fung's U.S. selling agent, and defendants United States, et al. Plaintiffs contest the final regulations promulgated by the United States Customs Service ("Customs") concerning the rules of origin for textile and apparel products. *See Rules of Origin for Textile and Apparel Prods.*, 60 Fed.Reg. 46,188 (Dep't Treas.1995). In addition to their cross-motion, defendants move to dismiss plaintiffs' action on the basis of certain jurisdictional defects.

### STATUTORY AND REGULATORY SCHEME

On December 8, 1994, President Clinton signed into law the Uruguay Round Agreements Act, Pub.L. No. 103–465, 108 Stat. 4809 (1994) ("URAA"). Section 334(a) of the URAA directs that the Secretary of the Treasury promulgate "rules implementing the principles contained in [section 334(b)] for determining the origin of textiles and apparel products." 19 U.S.C. § 3592(a) (1994). The principles set forth in section 334(b) provide, in relevant part, as follows:

(1) In General.—Except as otherwise provided for by statute, a textile or apparel product, for purposes of the customs laws and the administration of quantitative restrictions, originates in a country ... and is the growth, product, or manufacture of that country ..., if—

(A) the product is wholly obtained or produced in that country ...;

(B) the product is a yarn, thread, twine, cordage, rope, cable, or braiding and—

(i) the constituent staple fibers are spun in that country ..., or

(ii) the continuous filament is extruded in that country ...,

(C) the product is a fabric, including a fabric classified under chapter 59 of the [Harmonized Tariff Schedules of the United States ("HTSUS")], and the constituent fibers, filaments, or yarns are woven, knitted, needled, tufted, felted, entangled, or transformed by any other fabric-making process in that country ...; or

(D) the product is any other textile or apparel product that is wholly assembled in that country ... from its component pieces.

(2) Special Rules.—Notwithstanding paragraph (1)(D)—

(A) *the origin of a good that is classified under one of the following [HTSUS] headings or subheadings shall be determined under subparagraph (A), (B), or (C) of paragraph (1), as appropriate:* 5609, 5807, 5811, 6209.20.50.40, 6213, 6214, 6301, 6302, 6303, 6304, 6305, 6306, 6307.10, 6307.90, 6308, or 9404.90;[1] . . .

. . . .

(3) Multicountry Rule.—If the origin of a good cannot be determined under paragraph (1) or (2), then that good shall be considered to originate in, and be the growth, product, or manufacture of—

(A) the country . . . in which the most important assembly or manufacturing process occurs, or

(B) if the origin of the good cannot be determined under subparagraph (A), the last country . . . in which important assembly or manufacturing occurs.

19 U.S.C. § 3592(b) (1994) (emphasis added).

On May 23, 1995, Customs published a notice of proposed regulatory rules to implement the origin principles set forth above. *Rules of Origin for Textile and Apparel Prods.*, 60 Fed.Reg. 27,378 (Dep't Treas. 1995). In its notice, Customs addressed concerns as to the application of section 334(b)(2)(A), the "Special Rule" for products falling under certain HTSUS headings and subheadings. *See* 19 U.S.C. § 3592(b)(2)(A). Customs stated the following:

The words "as appropriate" in section 334(b)(2)(A) of the [URAA] appear to have created some confusion regarding the ap-

plication of that statutory provision. In this regard it has been suggested to Customs, for example, that because neither a bed sheet nor a comforter (each of which is classifiable in a tariff provision listed in section 334(b)(2)(A)) is a fabric, it would not be appropriate to determine the origin of the sheet or comforter by resorting to [section 334(b)(1)(C)] which on its face covers only fabric. Customs does not agree with this suggested interpretation because all of the HTSUS provisions listed in section 334(b)(2)(A) cover goods that have been advanced beyond the form of (in other words, have been made from) yarn, thread, etc., or fabric. Accordingly, the suggested interpretation would make a nullity of section 334(b)(2)(A).

60 Fed.Reg. at 27,382.

Following a period for public comment, on September 5, 1995, Customs published the final regulatory amendments implementing the new origin rules for textile and apparel products.[2] 60 Fed.Reg. at 46,188. In that notice, Customs adhered to its interpretation of the Special Rule for specified HTSUS headings and subheadings. Customs reasoned that as all of the HTSUS provisions "cover goods that have been advanced beyond yarn or fabric form, the origin of those goods should be determined by the yarns . . . or the fabrics which comprise the good." 60 Fed.Reg. at 46,192. Thus, for example,

when determining the origin of a bed sheet cut and finished in Country B from fabric woven in Country A, the appropriate rule

1. The enumerated headings and subheadings cover, in pertinent part, the following goods:

| Heading 5609 | Articles of yarn, strip, twine, etc. |
| Heading 5807 | Labels, badges of textile materials. |
| Heading 5811 | Quilted textile products. |
| Item 6209.20.50.40 | Diapers. |
| Heading 6213 | Handkerchiefs. |
| Heading 6214 | Shawls, scarves, mufflers, and the like. |
| Heading 6301 | Blankets and traveling rugs. |
| Heading 6302 | Bed, table, toilet, kitchen linens. |
| Heading 6303 | Curtains & interior blinds; curtain valances. |
| Heading 6304 | Other furnishing articles. |
| Heading 6305 | Sacks, bags used for packing goods. |
| Heading 6306 | Tarpaulins, awnings, sunblinds; tents; sails. |
| Subheading 6307.10 | Dishcloths, dusters, similar cleaning cloths. |
| Subheading 6307.90 | Other made up articles (e.g. surgical cloths). |
| Heading 6308 | Needlecraft sets consisting of woven fabric & yarn. |
| Subheading 9404.90 | Other bedding articles (e.g. pillows, cushions, similar furnishings). |

HTSUS, USITC Pub. 2831 (1995 & Supp. 1 1995) [hereinafter "HTSUS"].

2. The final rules provide that the regulations do not become effective until July 1, 1996. 60 Fed. Reg. at 46,188.

is [section 334(b)(1)(C)] which concerns the origin of fabrics.

Customs dismissed challenges to its interpretation of the Special Rule, maintaining that

> none of the interpretations suggested by those commentators adequately addressed the fact that all of the [HTSUS] headings and subheadings listed in [the Special Rule] provide for goods made from materials and that, therefore, the most reasonable interpretation of that section is that it is *appropriate* to determine the origin of those goods according to § 334(b)(1)(B), the rule for yarns, or § 334(b)(1)(C), the rule for fabrics.

60 Fed.Reg. at 46,192. Accordingly, Customs drafted the new regulations to reflect this position. In accordance with its interpretation of the Special Rule, Customs utilizes specific rules and requirements for determining the origin of goods falling under the enumerated HTSUS provisions. For example, "[t]he country of origin of a good classifiable under heading 6301 through 6306 is the country ... *in which the fabric comprising the good was formed by a fabric-making process.*"[3] 60 Fed.Reg. at 46,203 (emphasis added).

Herein lies the heart of plaintiffs' cause of action. Pac Fung, headquartered in Hong Kong, manufactures home textile articles, such as comforter shells, flat and fitted bed sheets, pillowcases, pillow shams, and duvet covers. Compl. ¶ 3, at 2. Pac Fung manufactures these products in factories located in Hong Kong, the People's Republic of China, and Macau, using fabric woven in various countries, but primarily in China. Plaintiffs indicate that all of the products manufactured by Pac Fung, and exported to the United States, fall within an enumerated tariff provision of the Special Rule.[4] *See supra* note 1; 19 U.S.C. § 3592(b)(2)(A). Under Customs' new final regulations, plaintiffs contend, those products manufactured by Pac Fung in Hong Kong or Macau using Chinese-woven fabric, will be deemed to originate in China. Thus, Pac Fung's imports of these products after July 1, 1996, the effective date of the new regulations, will be subject to quantitative textile restrictions on exports from China.

Plaintiffs assert that Customs' regulatory implementation of the statutory directive contained in section 334 of the URAA is arbitrary, capricious, and otherwise not in accordance with law. Plaintiffs ask the court to enjoin defendants from implementing and enforcing the new regulations, and request that the court remand this matter to the Department of the Treasury for the promulgation of new regulations that are in accordance with law. Defendants contend that the court should (1) dismiss plaintiffs' action for lack of subject matter jurisdiction and standing, or in the alternative, (2) enter summary judgment in defendants' favor.

## DISCUSSION

I. Defendants' Motion to Dismiss

A. Jurisdiction

■ Plaintiffs claim jurisdiction over Customs' promulgation of the final rules of origin, pursuant to 28 U.S.C. § 1581(i)(3), (4) (1988 & Supp. V 1993).[5] As is well estab-

---

**3.** Customs' new regulations define the fabric-making process as "any manufacturing operation that begins with polymers, fibers, filaments (including strips), yarns, twine, cordage, rope, or fabric strips and results in a textile fabric." 60 Fed.Reg. at 46,198.

**4.** These include flat and finished bed sheets, pillowcases, and duvet covers under Heading 6302, pillow shams and dust ruffles under Heading 6304, downproof comforter shells under Subheading 6307.90, and prefilled comforters and quilts under Subheading 9404.90 of the HTSUS. *See* Pls.' Mot.Summ.J. at 8 n. 7; *see also* Pls.' Mot.Order Establishing Expedited Litig. Schedule, Ex. A, ¶ 11, at 5 (statement of Fan Shi Hoo)

(indicating that "[f]or every product manufactured by Pac–Fung, ... [Customs' new] regulations would fix the origin of the merchandise, for quota and other purposes, as the country where the constituent fabric used to manufacture the product was woven in the 'greige' state") [hereinafter "Fan Statement"].

**5.** The statutory provisions provide that the court shall have exclusive jurisdiction of any civil action commenced against the United States ... that arises out of any law of the United States providing for—

 ....

 (3) embargoes or other quantitative restrictions on the importation of merchandise for

lished, section 1581(i) is a broad residual jurisdictional provision that " 'may not be invoked when jurisdiction under another subsection of § 1581 *is or could have been available,* unless the remedy provided under that other subsection would be manifestly inadequate.' " *Norcal/Crosetti Foods, Inc. v. United States,* 963 F.2d 356, 359 (Fed.Cir. 1992) (quoting *Miller & Co. v. United States,* 824 F.2d 961, 963 (Fed.Cir.1987), *cert. denied* 484 U.S. 1041, 108 S.Ct. 773, 98 L.Ed.2d 859 (1988)). Defendants assert that section 1581(i) jurisdiction is unavailable to plaintiffs because plaintiffs "have failed to establish that the customary basis for invoking this Court's jurisdiction over future entries, 28 U.S.C. § 1581(h), is manifestly inadequate." Defs.' Mot. to Dismiss & Cross–Mot. Summ. J. at 5. Section 1581(h), Title 28, United States Code, provides that the

> Court of International Trade shall have exclusive jurisdiction of any civil action commenced to review, prior to the importation of the goods involved, a ruling issued by the Secretary of the Treasury ... relating to classification, valuation, rate of duty, marking, restricted merchandise, entry requirements, drawbacks, ... or similar matters, but only if the party commencing the civil action demonstrates to the court that he would be irreparably harmed unless given an opportunity to obtain judicial review prior to such importation.

> reasons other than the protection of the public health or safety; or
> (4) administration and enforcement with respect to the matters referred to in paragraphs (1)–(3) of this subsection and subsections (a)–(h) of this section.

28 U.S.C. § 1581(i)(3), (4).

6. Plaintiffs present an alternative argument, relying upon *American Frozen Food Institute Inc. v. United States,* 855 F.Supp. 388 (Ct.Int'l Trade 1994). Plaintiffs contend that if the court finds that jurisdiction lay in section 1581(h), then Customs' new regulations constitute a reviewable "ruling" for purposes of that section. The court disagrees with plaintiffs' contention. *American Frozen Food* involved a Treasury decision, arising from a 19 U.S.C. § 1516 (1988) petition, regarding the proper placement of origin markings on packages containing imported frozen produce. 855 F.Supp. at 391. In their petition, certain U.S.-based frozen food packaging companies requested review of this issue and provided specific exemplars of labelling for their products. *Id.*

28 U.S.C. § 1581(h) (1988). In general, "an action designed to obtain judicial review of a ruling prior to importation cannot avoid the special provision of § 1581(h) by stating a cause of action under the court's residual jurisdiction." *Association of Food Indus., Inc. (Pistachio Group) v. Von Raab,* 9 CIT 626, 628, 624 F.Supp. 1557, 1558 (1985).

Both parties admit, however, that Customs has not issued a reviewable "ruling" as contemplated under section 1581(h).[6] Defendants assert that, absent a showing that relief under section 1581(h) is manifestly inadequate, plaintiffs first must seek a Customs ruling for Pac Fung's products based on the new country of origin regulations. Plaintiffs' failure to exhaust this remedy, according to defendants, would render a nullity to section 1581(h). The court disagrees.

 First, Customs has enunciated a regulatory scheme that plaintiffs contend is arbitrary, capricious, and not in accordance with the statutory directive contained in section 334(b)(2)(A) of the URAA. Thus, this is not an action seeking a determination as to the application of law to specific merchandise. It is a challenge to the law at issue, i.e. the general regulations. The court may conduct limited review of agency action to determine whether such action falls within the agency's congressionally-delegated authority and whether the statutory language authorizing the agency action has been properly construed. *Cf. Florsheim Shoe Co. v. United*

The court determined that the Treasury decision "function[ed] as a determination of the manner in which frozen produce imports will be treated" and constituted a "ruling that [was] sufficiently specific" for purposes of section 1581(h). In this case, Customs' new origin rules broadly cover all textile and apparel products. Although the challenged regulations here manifest the appropriate origin rules for certain HTSUS provisions, the court does not find that this constitutes a "ruling" within the contemplation of section 1581(h). Unlike the facts in *American Frozen Food,* Customs has not made a ruling on the basis of specific merchandise that plaintiffs intend to import under a specific set of circumstances. *See also Pagoda Trading Co. v. United States,* 6 CIT 296, 297–98, 577 F.Supp. 22, 23–24 (1983) (holding that Customs decision providing guidelines for classification of footwear, but not ruling specifically on merchandise intended to be imported, not § 1581(h) ruling).

*States,* 6 CIT 1, 11, 570 F.Supp. 734, 743 (1983) (discussing judicial review of exercise of broad discretionary authority delegated by Congress to President), *aff'd,* 744 F.2d 787 (Fed.Cir.1984); *see generally Spears v. Merit Sys. Protection Bd.,* 766 F.2d 520, 523 (Fed. Cir.1985) ("[R]egulations promulgated by an agency must be consistent with statutory provisions enacted by Congress."). It is properly within the jurisdictional province of the court to declare *ultra vires* and void, agency action that is beyond the scope of its defined statutory authority. *See Fieldston Clothes, Inc. v. United States,* 903 F.Supp. 72, 76 (1995); *Target Sportswear, Inc. v. United States,* 875 F.Supp. 835, 841, *aff'd,* 70 F.3d 604 (Fed.Cir.1995).

Second, the court finds any relief that might be provided by 28 U.S.C. § 1581(h) to be manifestly inadequate in this case; thus, exhaustion of this administrative remedy is not required. Customs has articulated its interpretation of the Special Rule for products falling under the enumerated HTSUS provisions, and the regulations are clearly drafted in order to implement this interpretation broadly. It would be futile for Pac Fung to seek numerous rulings for merchandise using Chinese-origin fabric, because it is clear how Customs will treat such merchandise under its new origin rules. Customs has no authority to deviate from its own regulations and can afford plaintiffs no relief pursuant to section 1581(h).[7]

Finally, jurisdiction pursuant to 28 U.S.C. § 1581(i) is appropriate because of the potential for immediate injury and irreparable harm. In addition to the potential impact Customs' interpretation will have upon the entire textile and apparel industry, products of Chinese-origin fabric would be subject to quantitative import restrictions imposed on textiles from China. Plaintiffs' affidavit submitted with its motion for expedited hearing makes clear that it cannot conduct its business in a commercially sound manner unless it knows whether its full range of goods will be restricted. *See* Fan Statement ¶ 15, at 7. Given the uncertainty of timely review by Customs of Pac Fung's numerous products, any remedy provided by section 1581(h) would be manifestly inadequate, even if futility were not an issue. *Cf. Mast Indus., Inc. v. Regan,* 8 CIT 214, 220–21, 596 F.Supp. 1567, 1573–74 (1984) (finding § 1581(a) protest procedures manifestly inadequate where interim regulations restricting imports posed potential for " 'immediate injury and irreparable harm to an industry and a substantial impact on the national economy' ").

Further, the court finds *American Ass'n of Exporters & Importers–Textile and Apparel Group v. United States,* 751 F.2d 1239 (Fed. Cir.1985) ("*AAEI–TAG* "), supportive of plaintiffs' jurisdictional claim under section 1581(i). In *AAEI–TAG,* the Federal Circuit held that exhaustion of protest procedures, which are analogous to obtaining a § 1581(h) ruling, is not required where prospective importers challenge Customs regulations imposing import restrictions. *Id.* at 1245–46. Here, the new regulations will restrict imports made from Chinese-origin fabric, and may result in an embargo of such textile and apparel products when quotas are full. The court finds this action ripe for review under 28 U.S.C. § 1581(i)(3) & (4), pertaining to, *inter alia,* the administration and enforcement of quantitative restrictions on the importation of merchandise.

### B. Standing

■ Defendants assert that plaintiffs lack standing to bring this action on the grounds that plaintiffs have not demonstrated any judicially cognizable injury. Specifically, defendants contend that plaintiffs have not alleged any "actual or imminent" injury, *see Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992), and that it is still speculative as to how the new regulations will apply, if at all, to Pac Fung's products. The court does not

---

**7.** The court disagrees with defendants' contention that "it is purely speculation that the new, yet to be implemented, regulation will apply to plaintiffs' merchandise in the manner plaintiffs suggest." Defs.' Mot. to Dismiss & Cross–Mot. Summ.J. at 11. On the contrary, Customs' artic-ulated interpretation of the Special Rule (the statute) is expressly delineated in the new regulations. Customs must apply the final rules of origin (the regulation) as they are written to any ruling on Pac Fung's products.

agree with defendants, and finds that plaintiffs have standing to bring their challenge.

Congress has provided that any civil action of which this court has jurisdiction may be commenced by "any person adversely affected or aggrieved by agency action within the meaning of [5 U.S.C. § 702]." 28 U.S.C. § 2631(i) (1988). Section 702, Title 5, United States Code, provides in part that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702 (1994). As indicated, Pac Fung exports to the United States the products of the type enumerated in the Special Rule of section 334(b)(2)(A), *see supra* note 4, and the regulations are clear as to how the country of origin will be determined for those products. Approximately 80% of Pac Fung's total factory output is exported to the United States. Fan Statement ¶ 3, at 2. In addition, China is the principal source of fabric for use in Pac Fung's home textile products. *Id.* ¶ 5, at 3.

Many of Pac Fung's products are also subject to textile quota category 362 restraints. *See* Pls.' Mem. P. & A. in Opp'n to Defs.' Mot. to Dismiss at 18. According to plaintiffs, China's Category 362 quota allocation has closed early in each of the past two years. *Id.* As a result, based on its 1995 performance, Pac Fung stands to lose United States orders valued at nearly $40 million per year for goods produced in its Hong Kong and Macau factories. Fan Statement ¶ 11, at 5. Further, investment in plant and equipment at the Hong Kong and Macau factories is valued at $9.5 million. *Id.* ¶ 13, at 6. The new regulations may require reorganization and/or relocation of its manufacturing and sourcing operations. *Id.* ¶ 15, at 7. These allegations support a finding of direct threat of injury to plaintiffs by Customs' new regulations.

## II. Plaintiffs' Motion for Summary Judgment

As previously noted, section 334(b) of the URAA sets forth the principles to be followed by Customs in issuing rules of origin for textile and apparel products. Section 334(b)(1) contains "general" rules of origin for most textile and apparel products. Section 334(b)(2) contains the Special Rule of origin at issue for products falling under certain enumerated tariff provisions. Section 334(b)(3) contains a "multicountry rule" of origin for products whose origin cannot be determined under (b)(1) or (2). 19 U.S.C. § 3592(b)(1)–(3). The country of origin for goods falling under the enumerated tariff provisions of the Special Rule, is determined by applying the first three principles contained in section 334(b)(1), that is, (A), (B), or (C), "as appropriate." The prefatory language to the Special Rule clearly indicates, and the parties admit, that the single country of assembly rule contained in section 334(b)(1)(D) is not to be applied.

Plaintiffs contest Customs' regulatory implementation of the Special Rule, primarily as it relates to the origin rule for fabrics in section 334(b)(1)(C). Section 334(b)(1)(C) determines the country of origin for merchandise if

> the product *is a fabric*, including a fabric classified under chapter 59 of the [HTSUS], and the constituent fibers, filaments, or yarns are woven, knitted, needled, tufted, felted, entangled, or transformed by any other fabric-making process in that country.

19 U.S.C. § 3592(b)(1)(C) (emphasis added) ("fabric origin rule"). First, plaintiffs point out that according to the common and ordinary meaning of the term "fabric", many of the Special Rule products fall within that definition, while others clearly do not. As the statutory language directs country of origin to be determined for products that are "fabrics", plaintiffs contend that Customs is incorrect in broadening the scope of that term to include products that have been advanced beyond the form of, or made up from, fabric. Defendants admit that the Special Rule products do not fall within the literal definition of "fabric," but contrary to plaintiffs' assertion, defendants contend that none of the Special Rule products satisfy that definition.

Second, plaintiffs assert that the statutory admonition to determine the origin of Special Rule goods according to section 334(b)(1)(A),

(B) or (C), "as appropriate," is intended to insure that origin of these products is determined when, by the statute's literal terms, it is appropriate to do so. Thus, plaintiffs contend, the origin of a Special Rule product will be determined by the first three principles contained in section 334(b)(1), that is, (1) when the product is "wholly obtained or produced" from a single country, (2) where the product is "yarn, thread," etc., or (3) where the product is a "fabric". If a Special Rule product does not fit within the literal terms of these three provisions, then, according to plaintiffs' interpretation of the statutory scheme, reference is made to Multicountry Rule in section 334(b)(3). The court disagrees with plaintiffs' construction of the statute.

As with any case involving statutory interpretation, the court first examines the language of the statute itself. *See, e.g., North Dakota v. United States*, 460 U.S. 300, 312, 103 S.Ct. 1095, 1102, 75 L.Ed.2d 77 (1983). The Special Rule provides that the country of origin for certain enumerated headings and subheadings "shall be determined under subparagraph (A), (B), or (C) of paragraph (1), as appropriate." 19 U.S.C. § 3592(b)(2)(A). The statute does not define the term "fabric", consequently the court must interpret the term according to its "ordinary, contemporary, and common meaning." *See National Customs Brokers and Forwarders Ass'n v. United States*, 14 CIT 108, 111, 731 F.Supp. 1076, 1079 (1990). The meaning of the term "must also be construed in the context of [its] enactment by the legislature." *Id.*

"Fabric" is defined as "[a] cloth produced [especially] by knitting, weaving, or felting fibers." *The American Heritage Dictionary* 484 (2d 1982). Plaintiffs argue that the term "fabric" is equivalent to "cloth" which is in turn the same as certain goods falling under the enumerated HTSUS provisions of the Special Rule, such as: handkerchiefs (Heading 6213); blankets (Heading 6301); sheets (Heading 6302); tarpaulins (Heading 6306); and dishcloths (Heading 6307.10). The court

disagrees. The court does not find that these products are "fabrics" within the ordinary, common definition of that term. Rather, the relevant enumerated tariff provisions cover products that are made from fabric, and generally processed into final form, including those listed by plaintiffs. Nonetheless, even though plaintiffs are correct that the Special Rule products at issue do not fall within the common meaning of the term "fabric", the question remains whether Congress intended the origin of such products to be determined according to the fabric origin rule in section 334(b)(1)(C).

 It is a fundamental principle of statutory construction that a statute should be interpreted so as not to render one part inoperative. *See, e.g., Department of Revenue of Or. v. ACF Indus., Inc.*, — U.S. —, — – —, 114 S.Ct. 843, 848–49, 127 L.Ed.2d 165 (1994). Adopting plaintiffs' construction of the statute defeats the purpose of enacting the Special Rule. If a Special Rule product were required to fall within the literal terms of section 334(b)(1)(B) or (C), that is, the good is literally a yarn, thread, etc., or fabric, then the country of origin of the good would be determined by subsection (B) or (C) in the first instance, and there would be no need for a special rule to specifically designate that those subsections apply. Similarly, if all the Special Rule products are not within (B) or (C) because they are advanced beyond the forms of yarn, thread, etc., or fabric, as Customs determined, then subsections (B) and (C) would never apply (be "appropriate") to confer origin, again rendering the designation of those subsections superfluous. The only reasonable construction of the statute is that the origin of the Special Rule products is determined by reference to the first three principles contained in section 334(b)(1)(A), (B) or (C), whichever is most appropriate.[8]

Furthermore, contrary to plaintiffs' contention, Customs' interpretation does not prevent the country of origin for "virtually

---

**8.** Even assuming, *arguendo*, that this question is sufficiently unanswered as to warrant an analysis under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the court finds that Customs' interpretation is a reasonable and permissible construction of the statute. As noted, plaintiffs' construction of the statutory scheme would render the Special Rule superfluous.

all" of the Special Rule products from being determined under the Multicountry Rule in section 334(b)(3). The Multicountry Rule is applied where the origin of a product cannot be determined according to the General Rules, section 334(b)(1), or the Specials Rules, section 334(b)(2). The rule directs the origin of a textile product to be determined according to the country where the "most important" or "last important" assembly or manufacturing process occurs. 19 U.S.C. § 3592(b)(3). Customs noted that the Special Rule goods may have their origin determined according to the Multicountry Rule when, for example, "a good is made from fabrics originating in different countries." *See* 60 Fed.Reg. at 46,192. The court finds no error in this construction of the statute.

### CONCLUSION

Defendants' motion to dismiss on jurisdictional grounds is denied. The court finds Customs' promulgation of its final regula-tions concerning the rules of origin for textile and apparel products to be in accordance with law. Accordingly, plaintiffs' motion for summary judgment is denied, and defendants' cross-motion for summary judgment is granted.

### JUDGMENT